# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

DAMON CRAWFORD,

                Petitioner,           :     Case No. 3:14-cv-022

   - vs -                             District Judge Thomas M. Rose
                                      Magistrate Judge Michael R. Merz

ERNIE MOORE, Warden,
 Lebanon Correctional Institution,

                              :

              Respondent.

# REPORT AND RECOMMENDATIONS

This habeas corpus case is before the Court for initial review pursuant to Rule 4 of the Rules Governing § 2254 Cases which provides in pertinent part:  "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition and direct the clerk to notify the petitioner."

Petitioner Crawford pleads that he was convicted in the Montgomery County Common Pleas Court on a count of murder with a firearm specification (Petition, Doc. No. 1, PageID 23, ¶ 5).  He was then sentenced to a term of imprisonment of eighteen years to life and seeks release from this term of imprisonment.

After sentencing, Crawford appealed to the Second District Court of Appeals which affirmed the conviction.  *State v. Crawford*, 2012-Ohio-3595, 2012 Ohio App. LEXIS 3187 (Aug. 10, 2012).  The Ohio Supreme Court declined jurisdiction over a subsequent appeal.  *State v. Crawford*, 2013-Ohio-158 (2013).

Crawford pleads three grounds for relief:

**Ground One:** The trial judge commited [sic] prejjudical [sic] error by failing to suppress statements that were illegally obtained.

**Ground Two:** The Ohio Constitution and Due Process Clause of the 14th Amendment to the United States [Constitution] require the [sic] every criminal conviction be supported by the appropriate amount and quality of evidence.

**Ground Three:** The prosecutor['s] closing arguments and disparaging comments served to deny appellant['s] due process and to vitiate the instant conviction.

(Petition, Doc. No. 1, PageID 27-30.)

The court of appeals described the background facts of the crime involved in this case:

[*P2] In the early morning of October 31, 1993, Ebony ("Punkin") Fisher was shot in the head while he was seated in a car in the parking lot of Spunky's bar. Several witnesses saw a man running away in the field adjacent to the bar's parking lot. Soon thereafter, Crawford was apprehended and arrested by Montgomery County deputy sheriffs and returned in a cruiser to Spunky's parking lot. Crawford was subsequently taken to the Jefferson Township police station and questioned by the Jefferson Township police about the shooting. After receiving *Miranda* warnings, Crawford invoked his right to counsel and to remain silent and was later released. No one was prosecuted for the murder at that time.

[*P3] In January 2008, Detective Brad Daugherty reopened the investigation of Fisher's Halloween 1993 murder. He spoke with the original witnesses as well as newly discovered witnesses and, in April 2009, after communicating with Crawford's parole officer, Daugherty questioned Crawford at the Adult Parole Authority's office. Crawford made incriminating statements during the interview.

*State v. Crawford*, 2012-Ohio-3595, ¶¶ 2-3, 2012 Ohio App. LEXIS 3187 (2nd Dist. 2012).

In the course of its opinion, the Second District decided on the merits all three claims which Crawford pleads in his Petition. When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the

state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000). Therefore the decision of the Second District Court of Appeals must be weighed against relevant Supreme Court case law.

## Ground One: Failure to Suppress Statements Obtained in Violation of the Fifth Amendment

In his First Ground for Relief, Crawford asserts he was convicted on evidence obtained from him in violation of his privilege against self-incrimination guaranteed by the Fifth Amendment as applied to the State of Ohio by the Fourteenth Amendment. The Second District decided this claim as follows:

> **[*P7]** In his first assignment of error, Crawford claims that the trial court erred in failing to suppress his statements to Detective Daugherty. [footnote omitted]
>
> **[*P8]** In reviewing the ruling on a motion to suppress, an appellate court must accept the trial court's supported findings of fact as true. *State v. Dudley*, 2d Dist. Montgomery No. 24904, 2012 Ohio 960,¶6. The court must then determine whether the facts satisfy the applicable legal standard; this is done without deference to the conclusion of the trial court. *Id*.
>
> **[*P9]** At the suppression hearing, the State presented the testimony of Krista Burke and Jason Butler, both of the Adult Parole Authority ("APA"), and Detective Daugherty of the Montgomery County Sheriff's Office. Their testimony established the following facts.
>
> **[*P10]** In November 2008, Burke became Crawford's parole officer after his release from prison on drug-related and weapon-related offenses. Burke initially met with Crawford at the

Montgomery County Jail, at which time Burke reviewed with Crawford the conditions of his parole. These conditions included that Crawford refrain from using illegal drugs and alcohol, that he be subject to random urine screens, and that he agree to warrantless searches of his person, vehicle and residence by a supervising officer or other employee of the Department of Rehabilitation and Corrections. Crawford signed a form, acknowledging these conditions.

[*P11] On March 9, 2009, Crawford came into Burke's office for a scheduled meeting, including a drug test. After Crawford failed the drug screening, he began to yell that people were trying to kill him and "you're not listening to me and I'm asking for help here." Crawford made "erratic comments" that Burke did not understand. Burke had Crawford walk back to her office so that she could address his failure to comply with his drug treatment program. Along the way, she asked Butler, another parole officer who knew Crawford, to walk with them and to help calm down Crawford.

[*P12] Once in Burke's office, Crawford asked for protection due to his belief that he was being investigated for a murder and that people were trying to kill him. Crawford told the parole officers that he had been at a bar named Spunky's on Halloween in 1992 or 1993, that he was pulled over by the police as he was walking home, and that he thought he was going to prison. Crawford told the officers that he was "real high" that night and had fallen asleep in the police cruiser, and he woke up when the cruiser was at a murder scene. Crawford stated that he was taken to jail and questioned, but was later released. Crawford stated that people had been trying to kill him since that time. Crawford also told Burke that he was taking notes and writing the story of his life, and he wanted to show the notes to her. Burke and Butler had not previously heard about the murder; when Crawford left, Burke told him to talk to her supervisor the following day.

[*P13] The following day, Crawford returned with his notebook and spoke with Burke, Burke's supervisor, and Butler. Butler made a copy of the notebook and returned the original to Crawford. After Crawford left, Burke contacted the Sheriff's Office to look into Crawford's claims. The following day, she spoke with Detective Daugherty, who informed her that he was investigating a cold case murder at Spunky's and that he had been interviewing people about the crime. Daugherty speculated that Crawford may have heard about the investigation.

4

[*P14] In mid-April 2009, Crawford was reassigned to Butler. On the morning of April 27, Detective Daugherty contacted Butler and told him that a confidential informant stated that there were weapons and drugs in Crawford's residence. Daugherty also told Butler that Crawford was a suspect in Fisher's murder and that he wanted to speak with Crawford. Daugherty and Butler planned to go together to Crawford's apartment that afternoon.

[*P15] By coincidence, Crawford came unexpectedly to Butler's office later that morning, and he asked Butler to copy a journal that he (Crawford) had. Crawford talked about needing protection. Butler contacted Daugherty and told the detective that Crawford was at the parole office. Daugherty stated that he would be there in five to ten minutes. Before the detective arrived, Butler asked Crawford, "Would you be willing to talk to the detectives without a lawyer present?" Crawford responded, "Yes. I want to get my story out there and I want to let them know what's going on with me." Butler explained to Crawford that he was not under arrest at that point; Butler did not inform Crawford of his *Miranda* rights.

[*P16] Daugherty and another detective, both in plain clothes, arrived within a few minutes. At Butler's suggestion, they moved to a small conference room, which was also located in a secure area of the office. Daugherty testified that he advised Crawford that he was not under arrest, and Crawford went back and forth about wanting a lawyer.

[*P17] Without Crawford's knowledge, Daugherty audio-recorded the interview. The trial court described portions of the audiotape, stating:

> * * * The audio of the interview reveals that in the first two and a half minutes of the encounter, Defendant stated three times that he wanted an attorney, but continued to converse with Daugherty. During this time, no questions were asked regarding the homicide. Daugherty testified, and the audio confirmed, that * * * he asked Defendant, "Here's the question, Damon. Do you want to talk with us without an attorney?" The audio provided in State's Exhibit 5 confirms that Defendant said, "yes." Defendant was also told at two minutes and fifty seconds that he was not under arrest and was free to leave. Defendant stated that he wanted to talk to the detectives. Defendant then proceeded to answer the detective's questions and elaborate on why people were trying to kill him. This information was similar to what Defendant had written in

5

the journal that he gave to Butler to copy. [Approximately 12 minutes into the interview, Crawford said that he was "cool with them Arlington Court people so they know I ain't killed Punkin yet."] At approximately 31 minutes into the interview, Defendant states that he wants to go [to] the job center, and 35 minutes into the interview, Defendant stated that he was through with Daugherty. A couple of minutes later, he stated that he wanted an attorney. The interview then ended * * *.

[*P18] Based on information that Crawford had possible drugs and guns at his residence, Butler handcuffed and detained Crawford in order to investigate those allegations. Butler testified that Crawford's detention was unrelated to the murder investigation.

[*P19] Butler and another parole officer took Crawford to his residence; the parole officers were followed by Detective Daugherty in a separate vehicle. Daugherty stood and chatted with Crawford outside the residence while Butler searched inside. After suspected heroin was located, Crawford was detained by the parole officers on a parole violation, and Daugherty took the suspected drugs in order to pursue new drug charges against Crawford.

[*P20] After Crawford was indicted for murder, Crawford moved to suppress the statements that he made to Daugherty and to his parole officers. The trial court found that Crawford's statements to the parole officers on March 9, March 10, and April 27 were voluntary and not the product of custodial interrogation. As for Crawford's statements to Daugherty on April 27, the trial court found Crawford did not unequivocally invoke his right to counsel prior to speaking with Daugherty and that Crawford was not subject to custodial interrogation when he was being questioned by the detective. In a footnote, the trial court noted that Crawford's invocation of his right to counsel in 1993 did not invalidate the statements he made in 2009. Finally, the court found that Crawford's statements to Daugherty outside of his (Crawford's) residence were unsolicited and did not require suppression.

[*P21] The Fifth Amendment to the United States Constitution provides that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself." The United States Supreme Court has held that the State may not use statements stemming from a defendant's custodial interrogation unless it demonstrates the use of procedural safeguards to secure the defendant's Fifth Amendment privilege against self-incrimination. *Miranda v.*

6

*Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). To counteract the coercive pressure of custodial interrogations, police officers must warn a suspect, prior to questioning, that he has a right to remain silent and a right to the presence of an attorney. *Maryland v. Shatzer*, U.S. , 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045 (2010), citing *Miranda*, 384 U.S. at 444. "After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present." *Id*.

[*P22] A defendant may waive his *Miranda* rights. *Id*. However, in order for a defendant's statements made during a custodial interrogation to be admissible, the State must establish that the accused knowingly, voluntarily, and intelligently waived his or her rights. *Miranda*, supra; *State v. Edwards*, 49 Ohio St.2d 31, 38, 358 N.E.2d 1051 (1976), overruled on other grounds, 438 U.S. 911, 98 S. Ct. 3147, 57 L. Ed. 2d 1155 (1978).

[*P23] In contrast to a defendant's Fifth Amendment rights, "the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings," including any police interrogation that occurs after an adversary judicial process has been initiated. *See Montejo v. Louisiana*, 556 U.S. 778, 786, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009). Unlike a defendant's right to counsel under *Miranda*, a defendant need not be in custody in order to assert his Sixth Amendment right to counsel, so long as an adverse criminal proceeding has begun. *Patterson v. Illinois*, 487 U.S. 285, 290, 298-99, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). To be clear, this case implicates Crawford's Fifth Amendment rights, not his rights under the Sixth Amendment.

[*P24] First, we agree with the trial court that Crawford's invocation of his right to counsel following his arrest in 1993 did not preclude Daugherty's 2009 questioning. A defendant's invocation of his Fifth Amendment right to counsel ends when there has been a break in custody sufficient to eliminate the coercive effects of police custody. *See Shatzer*, supra (where, after a 14-day break in "*Miranda* custody," police were permitted to question defendant, even though defendant had previously invoked his right to counsel and was in prison at the time on another matter). In this case, there was a 16-year delay between Crawford's initial questioning by the police, during which he invoked his right to counsel, and Daugherty's questioning in April 2009. Crawford's invocation of his Fifth Amendment right to counsel in 1993 did not

7

preclude Daugherty from attempting to question him without counsel in 2009.

[*P25] Second, the trial court did not err in concluding that Crawford was not in custody while he was questioned by Daugherty at the APA offices regarding Fisher's murder. The record reflects that Crawford voluntarily and unexpectedly came to the APA offices on April 27 in order to talk with Butler and to provide a copy of his journal. When Butler asked Crawford if he would be willing to talk with detectives without an attorney, Crawford agreed. Crawford was informed by Butler prior to the detective's arrival and by Daugherty within a few minutes of beginning the interview that he (Crawford) was not under arrest and that he was free to leave. Although Butler indicated that his office and the conference room were located in a secure area of the APA offices (i.e., a locked door separated the parole officers' offices from the waiting area), there is no suggestion that Crawford could not have left if he wished. Butler subjectively intended to detain Crawford for the parole violation after the interview ended, but there was no evidence that Crawford was aware of that intention when the interview began, and Crawford was not, in fact, detained until near the end of the interview with Daugherty. Based on the record, the trial court reasonably concluded that Crawford was not in custody when he spoke with Detective Daugherty about Fisher's murder on April 27, including during the time that Crawford stated that he "ain't killed Punkin yet." Accordingly, Crawford was not entitled to *Miranda* warnings prior to questioning by Daugherty, and the detective was not obligated to cease questioning Crawford when Crawford initially indicated that he wanted counsel.

[*P26] The trial court found that the interview concluded shortly after Crawford expressed that he wished to go to the job center and then requested an attorney. Approximately 30 minutes into the interview, Crawford indicated that he wanted to go to the job center, and he was told by Daugherty and Butler that he would be given a ride home. After a few additional questions related to Fisher's murder, Crawford asked for a lawyer and said he wanted the copy of his journal back. Butler then asked Crawford if he had contraband at his residence, and Crawford was subsequently handcuffed before being taken to his residence. Butler reiterated to Crawford that he was not under arrest at that time.

[*P27] Whether Crawford was in custody at the conclusion of the interview when he was handcuffed presents a closer question than whether Crawford was in custody when the interview began.

> Regardless, none of the statements that Crawford made at the conclusion of the interview were used against him by the State at trial. Accordingly, any error in the court's failure to suppress the statements Crawford made at the conclusion of the interview was harmless.
>
> **[\*P28]** The first assignment of error is overruled.

*State v. Crawford, supra*, ¶¶ 7-28.  In this decision the Second District carefully considered the facts found by the trial judge and applied the relevant United States Supreme Court precedent, including the recent decision in *Maryland v. Schatzer, supra.*  The Magistrate Judge concludes that application was not objectively unreasonable.  Crawford's First Ground for Relief should therefore be dismissed on the merits.


**Ground Two:  Insufficient Evidence**


In his Second Ground for Relief, Crawford contends he was convicted on evidence that was insufficient both as to quantity and quality.  Because Crawford is proceeding *pro se* , he is entitled to a liberal construction of his pleadings.  The Court therefore reads the Second Ground for Relief as asserting that the evidence presented was insufficient as a matter of due process of law under the Fourteenth Amendment.

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders,* 894 F.2d 792, 794 (6th Cir. 1990)(en banc). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt.  *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. at 319; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007). This rule was recognized in Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991). Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt. *In re Winship, supra.*

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"), two levels of deference to state decisions are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009).  In a sufficiency of the evidence habeas

corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and

then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v.*

*Palmer*, 541 F.3d 652 (6th Cir. 2008).

> We have made clear that *Jackson* claims face a high bar in federal
> habeas proceedings because they are subject to two layers of
> judicial deference. First, on direct appeal, "it is the responsibility of
> the jury -- not the court -- to decide what conclusions should be
> drawn from evidence admitted at trial. A reviewing court may set
> aside the jury's verdict on the ground of insufficient evidence only
> if no rational trier of fact could have agreed with the jury."
> *Cavazos v. Smith,* 565 U. S. 1, ___, 132 S. Ct. 2, 181 L. Ed. 2d
> 311, 313 (2011) (*per curiam*). And second, on habeas review, "a
> federal court may not overturn a state court decision rejecting a
> sufficiency of the evidence challenge simply because the federal
> court disagrees with the state court. The federal court instead may
> do so only if the state court decision was 'objectively
> unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U. S. ___, ___,
> 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. ___, ___, 132 S. Ct. 2060, 2062, (2012)(*per curiam*).

A state court finding that the verdict is not against the manifest weight of the evidence

implicitly also holds that there is sufficient evidence. *Nash v. Eberlin,* 258 Fed. Appx. 761, 2007

U.S. App. LEXIS 29645 (6th Cir. Dec. 14, 2007); *Ross v. Miller*, No. 1:10-cv-1185, 2011 U.S.

Dist. LEXIS 65082 (N.D. Ohio May 10, 2011)(White, M.J.); *Hughes v. Warden,* No. 1:10-cv-

091, 2011 U.S. Dist. LEXIS 54131 (S.D. Ohio Apr. 27, 2011)(Merz, M.J.).

The court of appeals' decision on Crawford's manifest weight of the evidence claim is as

follows:

> **[*P29]** Crawford's second assignment of error claims that his
> conviction was against the manifest weight of the evidence. He
> asserts that the State's witnesses, many of whom were recently
> released from prison, were not credible.

**[\*P30]** [A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009 Ohio 525,¶12. When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717 (1st Dist.1983); *State v. Elmore*, 111 Ohio St.3d 515, 2006 Ohio 6207, 857 N.E.2d 547,¶44.

**[\*P31]** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709, 1997 WL 476684, *4 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. Id.

**[\*P32]** The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**[\*P33]** The State's evidence at trial revealed the following facts:

**[\*P34]** At approximately 3:00 a.m. on October 31, 1993, Fisher was shot in the head while he was seated in the passenger seat of Deon Cunningham's silver Oldsmobile Delta in the parking lot of Spunky's, a night club formerly located at the intersection of Derby Road and Germantown Pike. The bullet entered above Fisher's right ear and traveled down and to the left, causing fatal injuries.

**[\*P35]** Kirby Ben-Israel [footnote omitted] (fka Kirby Peterson) testified that he, Crawford, Lamar Lenore, Darryl Jones, and two women drove around to different bars on the night of October 31, 1993. All of the men were drug dealers and all carried guns. Ben-Israel stated that they arrived at Spunky's around closing time and

12

parked "to the right and to the rear of the silver car that's parked there." Ben-Israel, Lenore, and Jones got out and walked around together; Crawford got out of the Ben-Israel's car and went off separately. The three men saw Fisher in the parking lot and spoke with him about rumors that he was targeting and robbing drug dealers. After a few minutes, the conversation ended, and Fisher walked over to and got into the front passenger side of the silver car; another man, (who other witnesses identified as Cunningham) was seated in the driver's seat. Ben-Israel briefly stood by the car and saw Fisher talk on a car phone.

[*P36] Ben-Israel testified that he then saw a man, whom he believed was Crawford, run up to the silver car and shoot Fisher with a "bright" revolver through the "cracked" (i.e., partially open) door. Although the shooter was masking his face, he was wearing the same clothes that Crawford had been wearing that night — maroon sweatpants and a black athletic jacket with "Sox" on the back. After the shooting, the shooter ran past the fence separating the property from a field. Ben-Israel, Lenore, Jones, and the women left in Ben-Israel's vehicle; Ben-Israel did not see Crawford again that night.

[*P37] Ben-Israel further testified that he later talked with Crawford about the shooting. Crawford had stated that he buried the gun in some leaves and that his brother had retrieved the gun for him. Crawford also reportedly stated that he shot Fisher because "he seen the opportunity and he took it" and "he can't negotiate with a guy like that." Crawford stated that he "did everybody a favor."

[*P38] Approximately 100 [**19] to 150 people were in the parking lot area at the time of the shooting, including Jefferson Township Police Chief Leon Frazier, Officer Steven Gephart, Darren Byrd, Kevin Byrd, and Paul Harrington.

[*P39] Harrington testified that, as he was leaving Spunky's around closing time on October 31, 1993, he was looking for his friend, Cunningham, who had left shortly before him. As he and a friend made their way to Cunningham's car, they saw Fisher talk to Cunningham and get into the front passenger seat. Fisher left the door open and used Cunningham's phone. Harrington saw someone wearing a hood walking toward the car from along the fence line; as the person got closer, Harrington recognized that it was Crawford. A few seconds later, Harrington heard a shot. Harrington saw Crawford "raise up from the back passenger door area and turn and take off and run * * * down the fence line area

13

and ran through the field." Harrington recalled that Crawford had a black hoodie jacket with white lettering on the back and that Crawford was wearing gloves.

[*P40] Darren Byrd testified that he was employed as a bouncer at Spunky's on October 31, 1993. As he was trying to disperse people from the area, he saw a silver car pull up near the building, playing music loudly. Darren saw Frazier (who was off-duty and providing security for Spunky's) approach the car and tell the driver to turn the music down. A few minutes later, Darren heard a single "pop" in the area of the silver car and heard a man say, "I've been shot." Darren observed that the car door was open, and he saw a man walking toward the back of the vehicle. Darren did not see the person's face, but the man was wearing a jacket with an "applique or something" on the back of a black jacket. The man walked along the fence line. At the time of the offense, Darren further recalled that the man had also worn a dark hooded sweatsuit, had "[s]omething shiny at his side," and "[took] off running."

[*P41] Kevin Byrd was employed at Spunky's to provide inside security. At around 2:30 a.m., when the bar closed, Byrd began dispersing people to their cars. Soon after, a fistfight broke out in the middle of the parking lot; Kevin and other security personnel went to break up the fight. Kevin left the altercation and began walking back toward the front entrance while the rest of the security personnel handled the fight. As he neared the front door, Kevin heard a gunshot and saw a man (who others identified as Cunningham) "jump out" of the driver's side and yell that he had been shot. When Kevin approached to see what was going on, the man said that "Punkin" was in the car.

[*P42] As Kevin went to the car, he saw another man "running around the fence line from that area and going around the fence" into a large field. The man was wearing maroon pants and a dark-colored jacket with "a big insignia on the back. Kind of looked like it might have said Sox or White Sox or something on the back." The man was carrying something that looked like a 9 mm or 45 mm silver handgun. Kevin testified that other patrons ran to their cars when they heard the gunshot, but he did not see anyone else run into the field.

[*P43] Officer Gephart was seated in his police cruiser in the Spunky's parking lot at the time of the shooting, and he drove to the location of Cunningham's car based on a radio call from Frazier that there had been a shooting by the front door. When Gephart arrived at Cunningham's car, he noticed that all of the vehicle's

windows were closed and unbroken. Gephart looked in and around the vehicle for the bullet, shell casing, and gun; he did not find them at the scene. After the vehicle was moved to a garage at the Sheriff's Office, a very small portion of the bullet was located in the dashboard. Gephart also obtained fingerprints from the exterior of the car, and a hair was collected from the exterior handle of the front passenger door.

[*P44] While at the scene, Gephart heard a broadcast on his police radio that a man was seen fleeing from the scene and heading north across the field adjacent to Spunky's parking lot. Within thirty minutes, Gephart heard that a Montgomery County sheriff's deputy had apprehended a suspect, who was later identified as Crawford.

[*P45] Crawford was taken into custody at 3:30 a.m. near the intersection of Gettysburg Avenue and Germantown Pike, at which time his clothing was collected. His clothing consisted of a White Sox Starter jacket with a hood, a hooded sweatshirt, gym shoes, and maroon sweatpants. Crawford's hands were tested for gunshot residue, but none was detected. He was subsequently released.

[*P46] Scott Moore testified that he spoke with Crawford in 1994, after his (Moore's) release from prison. Crawford told Moore that he discovered who had broken into his (Crawford's) grandmother's home and that he "took care of the person who did it" in Spunky's parking lot on Halloween night in 1993. Moore testified: "He told me the club had let out that night and he just saw Ebony Fisher, had saw Punkin in the parking lot and he said he watched him get into somebody's car and get on the telephone. And he said he decided to take him out at that point in time." Crawford told Moore that he had come from Marable's night club, which was near Spunky's, came along the passenger side of the car from the rear, stuck the gun in the car, and shot Fisher in the head with a .357 magnum. Crawford said he was wearing a hoodie, gloves, and a jacket. Crawford reported that he ran through the field after the shooting and discarded the hoodie, gun, and gloves as he ran. Crawford told Moore that he was apprehended, arrested, taken to jail, and tested for gunshot residue; Crawford indicated to Moore that the gunshot residue test was negative.

[*P47] Finally, Detective Daugherty testified regarding his cold case investigation. Daugherty reviewed the existing physical evidence and police file and spoke with various witnesses that were mentioned in the file. In April 2009, Daugherty spoke with Crawford about the homicide. Crawford stated that he was at Marable's in the early morning hours of October 31, 1993, and

15

members of both the Dayton View Hustlers and Arlington Court gang were there; Crawford was a member of the Dayton View Hustlers. During the conversation, Crawford stated that he was "still cool" with the Arlington Court gang "because I ain't killed Punkin yet." Crawford also asked for the return of the clothing that was collected from him in 1993. (On cross-examination, Daugherty further testified that Crawford denied killing Fisher and that Crawford said he had heard a rumor that Ben-Israel had killed Fisher.)

[**P48**] Dion Cunningham testified on Crawford's behalf. He stated that he went to Spunky's around 10:30 or 11:00 p.m. on October 30, 1993, with Harrington and Heath Harding. While there, he saw Fisher in the club and gave Fisher his phone number. When the club closed, Cunningham got into his car and pulled around to the front so that he could find Harrington and Harding. Cunningham was playing music loudly, and security told him to turn it down. While he was in his car, he saw Fisher walking toward him from the club. Fisher walked up and asked Cunningham if he could use the phone; Cunningham agreed and Fisher got into the front passenger seat. Before Fisher could use the phone, three men came up to Fisher and talked with him through the lowered passenger window. After making sure the men were not arguing, Cunningham turned his attention to some women with whom he was talking through his window. Within minutes, Cunningham heard a "loud muffle, boom," and saw that Fisher was shot. Cunningham thought he had been shot, too, and panicked.

[**P49**] After Cunningham's testimony, the parties stipulated that gunshot residue testing (atomic absorption testing) had been performed on Cunningham, Crawford, and Fisher. The results were negative for Crawford and Fisher, but positive for Cunningham's right palm.

[**P50**] Crawford claims that the State's witnesses were not credible and, therefore, his conviction should be reversed as against the manifest weight of the evidence. Crawford emphasizes that Ben-Israel had received a 24-year federal prison sentence for drug and escape charges, but he was released from prison early after cooperating in the investigation of this and another case; Ben-Israel did not identify Crawford as the shooter until September 1996, when he contacted federal agents and indicated that he would like to cooperate in the investigation of Fisher's murder in exchange for help in reducing his sentence. Crawford further argues that Ben-Israel "couldn't remember basic facts, e.g. whether

the shooting occurred on Halloween or Thanksgiving," rendering his testimony not credible.

[*P51] Similarly, Crawford argues that Moore, who was serving a 24-year federal prison sentence at the time of trial, did not contact the sheriff's department about Fisher's shooting until August 2010, after he heard from Ben-Israel that Ben-Israel had provided assistance in the investigation of two cold cases.

[*P52] Harrington also was serving a ten-year prison sentence for drug trafficking at the time of Crawford's trial. Although Harrington was questioned by Chief Frazier on the night of the shooting, he waited until 2008 to tell Daugherty that he "heard a rumor" that Crawford was the perpetrator and did not expressly identify Crawford as the shooter until 2010.

[*P53] Upon considering all of the evidence at trial, we do not agree that Crawford's conviction is against the manifest weight of the evidence. Although the witnesses' testimony varied to some degree and witnesses could not recall some details due to the passage of time, the State's witnesses described in a similar manner how the shooter approached Cunningham's car, shot Fisher, and fled into the field next to the property. Several witnesses described Crawford's clothing on that night and identified Crawford, or a man wearing clothes consistent with Crawford's, as the shooter. According to Moore and Ben-Israel, Crawford confessed to shooting Fisher on Halloween 1993.

[*P54] Though the jury heard that Harrington, Moore, and Ben-Israel had served or were serving lengthy prison sentences, each explained their reasons for not discussing the shooting with law enforcement near the time of the shooting. They all admitted that they had been drug dealers, and Ben-Israel and Harrington expressed that cooperating with the police would have harmed their reputations or endangered their lives. For example, Ben-Israel stated that going to the police "wouldn't have been a good thing to do back then for me * * * [b]ecause of the business I was in. That was a conflict." He stated that he decided to cooperate "so I can gain my life back." Harrington explained his failure to cooperate the past, saying, "I was a lot younger back then and I guess I didn't feel it was that important, you know, plus I was in the streets too, so I really wasn't into telling on nobody or snitching as they call it."

[*P55] Defense counsel thoroughly cross-examined Ben-Israel and Harrington about their failure to identify Crawford at the time of

the shooting and questioned Moore about his significant delay in contacting law enforcement about Crawford's confession. As stated above, the credibility of the witnesses and the weight to be given to their testimony were matters for the jury, as the trier of fact, to determine. Upon review of the record, the jury's decision to credit the State's evidence did not create a manifest injustice.

[*P56] The second assignment of error is overruled.

*State v. Crawford, supra*, ¶¶ 29-56. Considering the evidence recited by the Second District under the *Jackson v. Virginia* standard and giving the state courts the double deference required by AEDPA, there was plainly sufficient evidence presented to the jury to allow it to convict. Crawford's second Ground for Relief should also be dismissed with prejudice.

**Ground Three: Prosecutorial Misconduct**

In his Third Ground for Relief, Crawford asserts that arguments and comments by the prosecutor deprived him of due process and a fair trial. This claim was also decided on the merits by the Second District which held:

[*P57] In Crawford's third assignment of error, he argues that the prosecutor engaged in misconduct by disparaging defense counsel's argument in the State's rebuttal closing argument.

[*P58] In reviewing claims of prosecutorial misconduct, the test is whether the prosecutor's remarks were improper and, if so, whether those comments prejudicially affected the substantial rights of the defendant. *State v. Jones*, 90 Ohio St.3d 403, 420, 2000 Ohio 187, 739 N.E.2d 300 (2000). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Id*., *quoting Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct 940, 71 L.Ed.2d 78 (1982). Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011 Ohio 5418,¶21. We review allegations of prosecutorial misconduct in the context of the entire

trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008 Ohio 2900,¶42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

[*P59] During the State's rebuttal closing argument, the prosecutor stated:

> And the Defendant tried to beat Scott Moore up pretty bad. *He used the term "immaculate confession;" didn't he? Immaculate confession is cute; it's real cute*. But let's talk about what Scott Moore told you and why he would be in a position to know and hear what he heard and saw and came in and told you. * * * (Emphasis added.)

[*P60] Crawford did not object to the prosecutor's statement; therefore, he has waived all but plain error. *State v. Bryan*, 101 Ohio St.3d 272, 2004 Ohio 971, 804 N.E.2d 433,¶175. The plain error rule is to be invoked only under exceptional circumstances in order to avoid a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 95, 372 N.E.2d 804 (1978). Plain error does not occur unless, but for the error, the outcome of the trial clearly would have been different. *Id.* at 97; Crim.R. 52(B).

[*P61] We have cautioned that the prosecution's wide latitude to argue the relative strengths of its case and the relative weakness of the defense "does not extend as far as allowing the prosecution to denigrate the role of defense counsel." *State v. Thompson*, 161 Ohio App.3d 334, 2005 Ohio 2508, 830 N.E.2d 394,¶33. While the prosecutor's use of the words "real cute" may have been derisive and unnecessary, the record reflects that, by this isolated statement, the State was not trying to denigrate defense counsel as much as it was attempting to refute defense counsel's argument that Moore's testimony was not credible, as demonstrated by the extensive discussion of Moore's testimony that followed. Upon review of the entire trial, we find no plain error occurred.

[*P62] The third assignment of error is overruled.

*State v. Crawford, supra*, ¶¶ 57-62.

In deciding this third assignment of error, the Second District made two rulings which are material to this Court's consideration.   First of all, it found Crawford's counsel made no objection to the prosecutor's comment and therefore the claim was reviewed only for plain error.

Under federal law, a habeas petitioner cannot present a claim to the federal court for decision on the merits if he defaulted in presenting it to the state courts. The procedural default defense in habeas corpus is described by the Supreme Court as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107, 110 (1982). Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000)(citation omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle*, 456 U.S. at 110; *Wainwright*, 433 U.S. at 87. *Wainwright* replaced the "deliberate bypass" standard of *Fay v. Noia*, 372 U.S. 391 (1963). *Coleman*, 501 U.S. at 724.

Ohio's contemporaneous objection rule — that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Glaros*, 170 Ohio St. 471 (1960), paragraph one of the syllabus; *see also State v. Mason*, 82 Ohio St. 3d 144, 162 (1998) — is an adequate and independent state ground of decision. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir. 2012),*citing Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Biros v. Bagley,* 422 F.3d 379, 387 (6th Cir. 2005); *Mason v. Mitchell*, 320 F.3d 604 (6th Cir.

2003), *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir.), *cert. denied*, 131 S. Ct. 185 (2010).

A state appellate court's review for plain error is enforcement, not waiver, of a procedural default. *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012); *Jells v. Mitchell,* 538 F.3d 478, 511 (6th Cir. 2008); *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir. 2006); *White v. Mitchell,* 431 F.3d 517, 525 (6th Cir. 2005); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Hinkle v. Randle,* 271 F.3d 239 (6th Cir. 2001), *citing Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)(plain error review does not constitute a waiver of procedural default); *accord, Mason v. Mitchell,* 320 F.3d 604 (6th Cir. 2003). However, the opinion of a state court on plain error review is still entitled to AEDPA deference if the federal court reaches the merits despite the procedural default. *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009).

Because Crawford has shown no excusing cause for the lack of a contemporaneous objection, his Third Ground for Relief is procedurally defaulted.

However, even if the claim were preserved for merit review, it would not be successful. The Second District applied the applicable United States Supreme Court precedents and found that the prosecutor's comment, isolated as it was, did not deprive Crawford of a fair trial. Considering the issue on the merits, the Magistrate Judge finds this is not an objectively unreasonable application of clearly established Supreme Court precedent, *particularly Smith v. Phillips, supra*, and *Darden v. Wainright, supra*.

Therefore the Third Ground for Relief should be dismissed with prejudice.

**Conclusion**

Based on the foregoing analysis, it is respectfully recommended that the Petition herein be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous.

January 27, 2014.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).